IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Criminal Case No. **21-cr-414-RMR**

UNITED STATES OF AMERICA,

Plaintiff,

v.

1. ADEBAYO FASANYA,
a/k/a Richard Leo Johnston,
a/k/a James Morris,
a/k/a Laura Young,
a/k/a Amy Maine,
a/k/a Monica Brown,
2. DARO KOSIN,
3. ABRIELE J. KOSIN,
4. PORSHA PINCKEY,
a/k/a Porsha Pinckney,
a/k/a Laura Young,
a/k/a Amy Maine,
5. STEPHANIE GARCIA,
a/k/a Monica Brown,

Defendants.

---

**INDICTMENT**

---

The Grand Jury charges:

**COUNT 1**
(Conspiracy to Commit Money Laundering)

**BACKGROUND**

At all times relevant to this Indictment:

The Defendants and Co-Conspirators

1. Defendant ADEBAYO FASANYA, a/k/a "Richard Leo Johnston," "James

Morris," "Laura Young," "Amy Maine," "Monica Brown," ("FASANYA") was a Nigerian citizen residing in the United States. At various times, ADEBAYO maintained residences in Georgia and Idaho.

2. Defendant DARO KOSIN ("DARO") was a Nigerian citizen residing in the United States and was married to defendant ABRIELE J. KOSIN. DARO maintained a residence in Utah.

3. Defendant ABRIELE J. KOSIN ("ABRIELE") was a United States citizen who was married to defendant DARO KOSIN. ABRIELE maintained a residence in Utah.

4. Defendant PORSHA PINCKEY, a/k/a "Porsha Pinckney," "Laura Young," "Amy Maine," ("PINCKEY") was a United States citizen. At various times, PINCKEY maintained a residence in Georgia.

5. Defendant STEPHANIE GARCIA, a/k/a "Monica Brown," ("GARCIA") was a United States citizen. At various times, GARCIA maintained a residence in Georgia.

6. "Unnamed Co-Conspirator-1" ("UCC-1") was an individual unknown to the grand jury who worked to defraud Victim-1 through a business email compromise scheme.

7. "Unnamed Co-Conspirator-2" ("UCC-2") was an individual known to the grand jury who resided and worked in Georgia. UCC-2 was a business associate of ADEBAYO. UCC-2 conducted business in Georgia and controlled two Georgia based entities identified as Quagmire Global, LLC, and QG Autos, LLC.

8. "Unnamed Co-Conspirator-3" ("UCC-3") was an individual known to the grand jury who was married to defendant FASANYA and resided in Indiana.

9. "Unnamed Co-Conspirator-4" ("UCC-4") was an individual known to the grand jury whose exact residence location was unknown. UCC-4 was an associate and the sister of

FASANYA.

10. "Unnamed Co-Conspirator-5" ("UCC-5") was an individual known to the grand jury who resided in Georgia. UCC-5 was an associate of ADEBAYO. UCC-5 controlled a Georgia based entity identified as Prime Lux and Co.

Entities Used in the Course of the Conspiracy

11. BMI Innovation, LLC was a Georgia based entity linked to and used by FASANYA, GARCIA, and PINCKEY in the course of the conspiracy.

12. Full Exposure, LLC was a Utah based entity linked to and used by FASANYA, DARO and ABRIELE in the course of the conspiracy.

13. Jaes Jewlers, LLC was a Georgia based entity linked to and used by FASANYA and DARO in the course of the conspiracy.

14. Laura Young Creations, LLC was a Georgia based entity linked to and used by FASANYA in the course of the conspiracy.

15. Prime Lux and Company was a Georgia based entity linked to and used by FASANYA and UCC-5 in the course of the conspiracy.

16. Spendrupfan, LLC was a Georgia based entity with a bank account linked to and used by FASANYA in the course of the conspiracy.

Underlying Wire and Mail Fraud Schemes

17. A "business email compromise scheme" is a type of fraud scheme by which a scammer targets a business and its employees who perform legitimate transfer-of-funds requests on behalf of the business. The scammer may compromise legitimate business email accounts through social engineering or computer intrusion techniques. The scammer then uses the compromised business email account to trick the victim business and its employee into making

an unauthorized funds transfer to a bank account controlled by a conspirator.

18. A "romance fraud scheme" is a type of scheme by which a scammer targets person(s) looking for partners or friendship on dating websites and other social media platforms. The scammer may create profiles using fictitious or fake names, locations, images, and personas, allowing the scammer to cultivate relationships with prospective romance scheme victims. Victims may be convinced to provide money or gifts to the scammer, or may be asked to conduct transactions on behalf of the scammer.

19. An "ACH fraud scheme" is a type of scheme by which a scammer poses as a legitimate vendor and contacts a victim business. The scammer in turn submits some type of "change of payment form" or similar notification to the business in which the scammer requests that the business make an ACH payment into an account – which unknowing to the business – is controlled by the scammer. An "ACH transfer" is an electronic, bank-to-bank money transfer of funds which are processed through the Automated Clearing House ("ACH") Network.

**CONSPIRACY TO COMMIT MONEY LAUNDERING**

20. Beginning in approximately May of 2017, and continuing through and including on or about June 22, 2021, in the State and District of Colorado and elsewhere, defendants ADEBAYO FASANYA, DARO KOSIN, ABRIELE J. KOSIN, PORSHA PINCKEY, STEPHANIE GARCIA, and UCC-1, UCC-2, UCC-3, UCC-4, and UCC-5 did knowingly and voluntarily conspire and agree together and with each other, and with other persons both known and unknown to the grand jury (collectively referred to as "co-conspirators"), and aided and abetted the same, to:

(a.) knowingly conduct and attempt to conduct financial transactions affecting interstate and foreign commerce, which involved the proceeds of a specified unlawful activity,

that is, mail fraud, wire fraud and conspiracy to commit the same in violation of 18 U.S.C. §§ 1341, 1343, and 1349, knowing that the transactions were designed in whole or in part to conceal or disguise the nature, location, source, ownership, and control of the proceeds of a specified unlawful activity, and that while conducting and attempting to conduct such financial transactions, knew that the property involved in the financial transactions represented the proceeds of some form of unlawful activity, in violation of Title 18, United States Code, Section 1956(a)(1)(B)(i); and

(b.) knowingly engage and attempt to engage in monetary transactions by, through, and to a financial institution, affecting interstate and foreign commerce, in criminal derived property of a value greater than $10,000, such property having been derived from a specified unlawful activity, that is, mail fraud, wire fraud and conspiracy to commit the same in violation of 18 U.S.C. §§ 1341, 1343, and 1349, and in violation of Title 18, United States Code, Section 1957(a).

**MANNER AND MEANS OF THE CONSPIRACY**

Acting interdependently, the Defendants and others both known and unknown to the grand jury, carried out the conspiracy using the following manner and means:

21. The co-conspirators would and did use online dating websites and social media platforms to defraud victims.

22. The co-conspirators would and did establish purported relationships with victims by misrepresenting their identities and offering false promises.

23. The co-conspirators would and did fraudulently induce victims to send money to the co-conspirators.

24. The co-conspirators would and did conceal money by depositing it into accounts

associated with the co-conspirators.

25. The co-conspirators would and did create online dating profiles using fake names, locations, images, and personas.

26. The co-conspirators would and did claim to be working in foreign countries.

27. The co-conspirators would and did build rapport with "romance scheme" victims using a variety of means and facilities of interstate communication, including but not limited to emails, text messages, and internet communications on social media platforms, including “Google Hangouts.”

28. The co-conspirators did fraudulently represent to "romance scheme" victims that they had encountered a financial crisis for which they needed money, funds, and assistance from victims.

29. The co-conspirators would and did fraudulently induce "romance scheme" victims to conduct and otherwise facilitate financial transactions on behalf of and for the benefit of the co-conspirators.

30. The co-conspirators would and did fraudulently represent to "romance scheme" victims that they needed money to complete their work.

32. The co-conspirators would and did fraudulently promise to repay the "romance scheme" victims.

33. Later in the "romance scheme" the co-conspirators would and did make requests for large sums of money, including requests in excess of tens of thousands of dollars.

34. The co-conspirators would and did direct "romance scheme" victims to send

money to specific accounts and addresses in the United States.

35. The co-conspirators did instruct victims to send funds using interstate wire communications to include electronic funds and wire transfers.

37. The co-conspirators would and did trick victims of "business email compromise schemes" and "ACH fraud schemes" into making unauthorized transfers of victims' funds.

38. The co-conspirators would and did compromise the email accounts of victim businesses for purposes of carrying out "business email compromise schemes."

39. The co-conspirators would and did make cash deposits into bank accounts controlled by and associated with the co-conspirators.

40. The co-conspirators would and did distribute the fraudulently obtained funds to other members of the conspiracy to conceal the true nature of their fraudulently obtained funds.

41. The co-conspirators would and did obtain and use fraudulent passports and other identity documents to open bank accounts in fake names.

43. The co-conspirators would and did use the same residential address to open and maintain many of the bank accounts.

45. The co-conspirators did convert the fraudulently obtained proceeds to their personal use.

48. The co-conspirators would and did communicate with each other using "TextNow" and "WhatsApp".

## OVERT ACTS

In furtherance of the conspiracy and to achieve its objective, one or more of the co-conspirators, committed one or more of the following acts in the State and District of Colorado and elsewhere:

### The Co-Conspirators Opened and Maintained Multiple Bank Accounts

49. In order to receive funds from victims of the conspiracy, the co-conspirators established, maintained and used multiple bank accounts. Proceeds from the wire and mail fraud schemes were often deposited into these accounts throughout the conspiracy and funneled to other members of the conspiracy. Often the bank accounts used by the co-conspirators to transfer and handle victim funds were nominee accounts which were held in the name of a shell company, or in the name of another person who was not a member to the conspiracy. In some cases, the co-conspirators used bank accounts which were held in the name of an alias or stolen identity.

50. On or about the dates below, the co-conspirators established the following accounts which were used in the course and furtherance of the conspiracy

| DATE OPENED | BANK NAME | ACCOUNT NUMBER | NAME ON ACCOUNT (name type) | DEFENDANT(S) LINKED TO ACCOUNT BY USE/CONTROL | HEREINAFTER |
|---|---|---|---|---|---|
| 11/28/16 | JPMorgan Chase | # 3139 | Asha Mari Halverson or Jason Edward Halverson | DARO | Halverson Chase Account (#3139) |
| 10/18/18 | PNC Bank | # 7209 | Richard Leo Johnston (alias) | FASANYA | Richard Johnston PNC account (#7209) |
| 12/22/18 | Wells Fargo | # 0545 | Abriele Jordyn Kosin | ABRIELE, DARO, FASANYA, UCC-3 | Abriele Wells Fargo account (#0545) |
| 1/30/19 | JPMorgan Chase | # 9026 | Abriele Jordyn Kosin | ABRIELE, DARO, FASANYA, UCC-3 | Abriele Chase account (#9026) |
| 5/1/19 | JPMorgan Chase | # 8280 | Spendrupfan LLC (alias) | FASANYA | Spendrupfan Chase account (#8280) |
| 5/4/19 | JPMorgan Chase | # 3581 | Full Exposure LLC | ABRIELE, DARO, FASANYA, UCC-3 | Full Exposure Chase account (#3581) |
| 5/13/19 | Wells Fargo | # 1063 | Jaes Jewelers LLC (alias) | FASANYA | Jaes Jewelers LLC Wells Fargo account (#1063) |
| 6/3/20 | JPMorgan Chase | # 8489 | Laura Young (alias) | FASANYA PINCKEY | Laura Young Chase account (#8489) |
| 6/3/20 | Bank of America | # 2620 | BMI Innovation LLC (alias) | FASANYA, GARCIA | BMI Innovation LLC BOA account (#2620) |
| 6/9/20 | JPMorgan Chase | # 2847 | Monica Brown (alias) | FASANYA GARCIA | Monica Brown Chase account (#2847) |
| 6/26/20 | SunTrust/Truist | # 1358 | Laura Young Creations LLC (alias) | FASANYA PINCKEY | Laura Young Creations Sun Trust account (#1358) |
| 7/21/20 | Citibank | # 3749 | Amy Maine (alias) | FASANYA, PINCKEY | Amy Maine Citibank account (#3749) |
| 4/21/21 | SunTrust/Truist | # 0064 | Prime Lux and Co | FASANYA UCC-5 | Prime Lux Sun Trust account (#0064) |
| 4/21/21 | Fifth Third Bank | #1295 #1131 | BMI Innovation (alias) | FASANYA PINCKEY | BMI Innovation Fifth Third accounts (#1295 and #1131) |

51. In connection with some of the bank accounts involved in the conspiracy, co-

conspirators used alias names, false information, and fraudulent supporting documentation when establishing and using the accounts as set forth below:

*Richard Leo Johnston*

52. On or about March 18, 2018, FASANYA opened a bank account with PNC Bank (account ending #7209), using the alias "Richard Leo Johnston". In connection with the application for this account, FASANYA submitted a fraudulent Ghana passport and U.S. visa number for "Richard Leo Johnston".

*James Morris Account*

53. On or about March 30, 2019, FASANYA opened a bank account with JP Morgan Chase Bank (account ending #8571), using the alias "James Morris". In connection with the application for this account, FASANYA submitted a fraudulent Georgia driver's license and South African passport for "James Morris".

*SpendrupFan LLC Account*

54. On or about April 22, 2019, FASANYA opened a business bank account in the name of "Spendrupfan LLC" with JP Morgan Chase Bank (accounting ending #8280), using the alias "James Morris". In connection with the application for this account, FASANYA submitted a fraudulent Georgia driver's license number and South African passport for "James Morris".

*Jaes Jewelers Account*

55. On or about May 13, 2019, FASANYA opened a business bank account in the name of "Jaes Jewlers" with Wells Fargo (accounting ending #1063), using the alias "James Morris". In connection with the application for this account, FASANYA submitted a fraudulent Georgia driver's license and South African passport for "James Morris".

*Laura Young Account*

56. On approximately June 2, 2020, FASANYA and PINCKEY exchanged information over WhatsApp in which they shared personal identifiable information related to establishing an alias account in the name of "Laura Young" with JP Morgan Chase Bank.

57. On or about June 3, 2020, FASANYA and PINCKEY worked together to open a bank account with JP Morgan Chase Bank (account ending #8489), using the alias "Laura Young". In connection with the online application for this account, FASANYA submitted a fraudulent driver's license number and date of birth for "Laura Young".

*BMI Innovations LLC Account*

58. On or about June 3, 2020, FASANYA opened a business bank account in the name of "BMI Innovations LLC" with Bank of America (accounting ending #2620), using the alias "Monica Brown". In connection with the application for this account, FASANYA submitted a fraudulent tax identification number for "Monica Brown".

59. On or about April 21, 2021, PINCKEY, with assistance from FASANYA, opened two business bank accounts in the name of "BMI Innovation LLC" with Fifth Third Bank (accounts ending 1295 and 1311), using the alias "Monica Brown". In connection with opening the accounts, PINCKEY held herself out to be "Monica Brown" when making the opening cash deposits for the accounts. On May 27, 2021, the Fifth Third BMI Innovation account (#1295), received an incoming wire transfer for $99,000 – of which, a portion of this deposit was later determined to be from a business email compromise scheme.

*Monica Brown Account*

60. On or about June 9, 2020, FASANYA opened a bank account with JP Morgan Chase Bank (account ending #2847), using the alias "Monica Brown". In connection with the online application for this account, FASANYA submitted a fraudulent driver's license number

and social security number for "Monica Brown".

*Laura Young Creations LLC Account*

61. On or about June 26, 2020, FASANYA opened a business bank account in the name of "Laura Young Creations LLC" with SunTrust Bank (accounting ending #1358), using the alias "Laura Young". In connection with the application for this account, FASANYA submitted fraudulent personal identifiable information to the bank.

*Amy Maine Account*

62. On or about July 21, 2020, FASANYA and PINCKEY worked together to open a bank account with Citibank (accounting ending #3749), using the stolen identity of "Amy Maine". In connection with the online application for this account, FASANYA and PINCKEY submitted a false Maryland driver's license to Citibank in the name of "Amy Maine". FASANYA and PINCKEY opened the account using a cashier's check issued by Victim 11 to "Ms. Amy Maine" in the amount of $251,817.

63. Sometime in approximately August of 2020, PINCKEY contacted a Citibank customer representative on the telephone and falsely purported to provide the phone number for "Amy Maine" in an effort to obtain access to the funds contained within the Amy Maine Citibank account (#3749). FASANYA assisted PINCKEY in her communication with Citibank.

64. On or about September 10, 2020, FASANYA sent a message to PINCKEY which contained personal information about "Amy Maine" including her telephone number for purposes of gaining access to the Amy Maine Citibank account (#3749).

**<u>The Co-Conspirators Obtained Victim Proceeds Derived from Wire Fraud and Mail Fraud Schemes and then Distributed the Proceeds to Co-Conspirators</u>**

*Victim 1*

65. Victim 1 was a business located in Centennial, Colorado. In September of 2019, UCC-1 worked with co-conspirators to defraud Victim 1 through a business email compromise fraud scheme. In September of 2019, UCC-1 compromised Victim 1's email system and then submitted a fraudulent invoice to Victim 1 requesting payment in the amount of $122,760. Victim 1 was tricked into paying the fraudulent invoice believing it was payment to a legitimate vendor.

66. As part of the scheme, the following events occurred and representations were made:

a. On September 27, 2019, UCC-1 -- posing as a legitimate employee of Victim 1 -- sent an email to an accounting clerk for Victim 1 who was located in Colorado. The email contained a fraudulent invoice and requested that the clerk make payment in the amount of $122,760 to a supposed vendor in Arizona.

b. On September 27, 2019, the accounting clerk for Victim 1 – relying on the fraudulent UCC-1 email -- sent an interstate wire of $122,760 from Colorado to Arizona for payment. Victim 1's wired funds did not go to a legitimate vender but instead were sent to an account that belonged to Victim 2.

c. On September 30, 2019, at the direction of co-conspirators, Victim 2 purchased a $61,500 cashier's check using funds from Victim 1's wire transfer. The stolen funds were later received and controlled by DARO, FASANYA, ABRIELE, and UCC-3 before the funds were ultimately recalled by the bank.

d. On September 30, 2019, UCC-1 -- again posing as a legitimate employee of Victim 1 -- sent another email to an accounting clerk for Victim 1 in Colorado which contained another fraudulent invoice. The invoice sought payment from Victim 1 in the amount

of $498,560 to an international company in Hong Kong using the Bank of China. Victim 1 did not pay the invoice after realizing it was fraudulent.

*Victim 2*

67. Victim 2 was a resident of Prescott Valley, Arizona. Victim 2 began a romantic relationship on an online dating website in approximately mid-2019 with an individual using the name "Christina Montee"**.** Victim 2 and "Montee" communicated by email and electronic messages to include Google Hangouts. Ultimately, Victim 2 was duped by "Montee" into allowing her bank account to be used for the receipt, deposit and transfer of fraudulently obtained funds. Later, it was determined that the funds which "Montee" caused to be deposited into Victim 2's bank account were proceeds from a business email compromise scheme in which Victim 1, a Colorado company, was defrauded. The relationship between Victim 2 and Montee lasted through approximately October of 2019.

68. As part of the scheme, the following events occurred and representations were made to Victim 2:

a. "Montee" asked Victim 2 to allow for the deposit of an "inheritance payment" into Victim 2's bank account as "Montee" was located outside of the U.S. and did not have a U.S. based bank account to deposit the payment for future use.

b. "Montee" stated that she would soon return to the United States and marry Victim 2 and would use the payment toward the purchase of a vehicle and other expenses.

c. "Montee" directed Victim 2 to provide her with Victim 2's bank account information so that the inheritance payment could be deposited into Victim 2's bank account. The supposed inheritance payment was in fact fraud proceeds derived from a business email compromise scheme involving Victim 1, a business located in Centennial, Colorado, and

referenced above in this Indictment.

69. As part of the conspiracy, "Montee" worked with UCC-1, DARO, ABRIELE, FASANYA, and other co-conspirators to cause the following funds transfers:

a. On September 27, 2019, "Montee", UCC-1, DARO, ABRIELE, and FASANYA, working together, caused a wire transfer of $122,760 from Victim 1's US Bank account in the State of Colorado to be deposited into Victim 2's One Arizona Credit Union account (#0139) in the State of Arizona. This transfer of funds was a wire communication and a financial transaction which involved the movement of funds by wire which affected interstate commerce. At the time of this wire transfer, both U.S. Bank and One Arizona Credit Union were financial institutions who were engaged in activities which affected interstate commerce.

b. On or about September 30, 2019, "Montee" directed Victim 2 to purchase a $61,500 certified check payable to Full Exposure LLC using the funds "Montee" recently caused to be deposited into Victim 2's bank account. "Montee" explained to Victim 2 that the Full Exposure LLC was her deceased father's construction company. Full Exposure LLC was in fact a business registered in the state of Utah and utilized by DARO, ABRIELE, and FASANYA to collect and transfer fraud funds as part of the conspiracy.

c. On or about September 30, 2019, "Montee" also directed Victim 2 to obtain a Western Union a money order and have it sent to "Montee's" neighbor, as "Montee" did not have the required identification to obtain the money order directly in France.

d. On September 30, 2019, Victim 2 obtained and attempted to make a Western Union money order for $2,999 for a "Doris John" at Montee's direction.

e. On or about September 30, 2019, at "Montee's" direction, Victim 2 visited Chase branch bank in Arizona and deposited a $61,500 cashier's check into the Full Exposure

Chase account (#3581). A portion of the deposited funds were later received and controlled by DARO, FASANYA, ABRIELE, and UCC-3 before Chase Bank put a stop payment on the cashier's check.

*Distribution of Victim 1 Fraud Proceeds by/to Members of the Conspiracy*

70. On September 30, 2019, FASANYA, working with DARO and ABRIELE, made a $3,000 Cash App payment to UCC-3 attempting to use funds from the Full Exposure LLC Chase account (#3581).

71. On October 1, 2019, FASANYA, working with DARO and ABRIELE, made a $2,280 Cash App payment to FASANYA attempting to use funds from the Full Exposure LLC Chase account (#3581).

72. On October 1, 2019, FASANYA, working with DARO and ABRIELE, made a $280 Cash App payment to DARO attempting to use funds from the Full Exposure LLC Chase account (#3581).

73. On October 1, 2019, FASANYA, working with DARO and ABRIELE, made a $300 Zelle payment to ABRIELE attempting to use funds from the Exposure LLC Chase account (#3581).

*Victim 3*

74. Victim 3 was a resident of Honolulu, Hawaii. In approximately 2018, Victim 3 began a relationship on a social media website with an unknown individual claiming to be a woman ("unknown woman") . The unknown woman claimed to Victim 3 that she needed to be with a man in order to receive her father's multi-million dollar inheritance. Several months later in early 2019, Victim 3 was contacted by an individual using the name "Edwin Flores" who claimed to be an attorney representing the unknown woman and her inheritance.

75. The unknown woman and "Flores" communicated with Victim 3 through email and text message. Ultimately, Victim 3 was duped out of funds as a result of a romance fraud scheme carried out by the unknown woman and "Flores". Victim 3's relationship with the unknown woman and "Edwin Flores" lasted through approximately February of 2019.

76. As part of the scheme, the following representations were made:

a. The unknown woman asked Victim 3 to marry her in order to obtain the inheritance.

b. "Flores" stated that the unknown woman had died and that Victim 3 was the beneficiary of a multi-million dollar inheritance from unknown woman's deceased father.

c. "Flores" stated that taxes and fees needed to be paid in advance of Victim 3 obtaining the inheritance.

d. "Flores" stated that if Victim 3 did not continue to make payments for taxes and fees related to the "inheritance", that "Flores" would pursue legal action against Victim 3 to obtain the fees.

e. "Flores" directed Victim 3 to make payments for the taxes and fees associated with obtaining the "inheritance" to a bank account identified as belonging to ABRIELE.

77. On February 27, 2019, at "Flores's" direction, Victim 3 made a wire transfer of $49,930 payable to "Abriele J Kosin" which funds were deposited into ABREILE's Chase account (#9026). The deposited funds were later received and controlled by ABRIELE, DARO and FASANYA.

*Distribution of Victim 3 Fraud Proceeds by/to Members of the Conspiracy*

78. On or about February 28, 2019, through March 1, 2019, FASANYA, DARO and

ABRIELE made three cash withdrawals totaling $7,380 from the Abriele Chase account (#9026).

79. On March 22, 2019, FASANYA, working with DARO and ABRIELE, made a $40,000 interstate wire transfer from the Abriele Chase account (#9026) to UCC-3 in Atlanta.

*Victim 4*

80. Victim 4 was a resident of Appleton, Wisconsin. In approximately February of 2019, Victim 4 began a romantic relationship on an online dating website with an individual using the name "James Furst". Victim 4 and "Furst" communicated by text message and telephone calls. Ultimately, Victim 4 was duped out of funds as a result of a romance fraud scheme. The relationship lasted through approximately late March of 2019.

81. As part of the scheme, the following representations were made:

a. "Furst" asked Victim 4 to make payments on behalf of Furst as he was located outside of the U.S. and his bank account funds were frozen.

b. "Furst" needed funds to hire an attorney as he was taken into custody and his passport was seized by immigration authorities.

c. "Furst" stated that he expected to receive a payment from a business transaction which he would use to repay Victim 4.

d. "Furst" directed Victim 4 to make two payments, in amounts less than $10,000, via wire transfer to a Utah based bank account identified as belonging to ABRIELE.

82. At "Furst's" direction, Victim 4 made the following funds transfer:

a. On March 20, 2019, Victim 4 made a wire transfer of $9,000 payable to "Abriele J. Kosin" which funds were deposited into the ABREILE Chase account (#9026).

b. On March 20, 2019, Victim 4 made a second wire transfer of $9,000 payable to "Abriele J Kosin" which funds were deposited into the ABREILE Chase account

(#9026).

83. At "Furst's'" direction, Victim 4 sent a total of $18,000 via two wire transfers to an individual identified as ABRIELE during the course of the scheme. Each of the wire transfers contained a notation which stated: "Funds for James Fan Furst in Beijing." The deposited funds were later received and controlled by FASANYA, DARO, and ABRIELE.

*Distribution of Victim 4 Fraud Proceeds by/to Members of the Conspiracy*

84. On or about March 20, 2019, ABRIELE made two Zelle transfers totaling $500 to herself using funds from the Abriele Chase account (#9026).

85. On March 21, 2019, FASANYA, working with DARO and ABRIELE, made a Zelle transfer of $2,000 to UCC-3 using funds from the Abriele Chase account (#9026).

86. On March 22, 2019, FASANYA, working with DARO and ABRIELE, made a $9,600 wire transfer from the Abriele Chase account (#9026) to UCC-3.

87. On March 22, 2019, FASANYA, working with DARO and ABRIELE, made a $5,220 wire transfer from the Abriele Chase account (#9026) to UCC-3.

*Victim 5*

88. Victim 5 was a resident of Cathedral City, California. Victim 5 began a romantic relationship on an online dating website in approximately 2019 with an individual using the name "Albert Leonard". Victim 5 and "Leonard" communicated by text message and emails. Ultimately, Victim 5 was duped out of funds as a result of a romance fraud scheme. The relationship lasted through late 2020.

89. As part of the scheme, the following representations were made:

a. "Leonard" asked Victim 5 to make payments on behalf of "Leonard" because "Leonard" needed funds to purchase materials for his international construction

business.

b. "Leonard" later asked Victim 5 to make payments on behalf of "Leonard" because "Leonard" had been taken into custody and needed a food allowance and funds to get out of jail.

c. "Leonard" directed Victim 5 to deposit cash payments into a bank account identified as belonging to Full Exposure LLC and another bank account identified as belonging to Jaes Jewelers LLC.

90. At "Leonard's" direction, Victim 5 made the following funds transfers:

a. On August 1, 2019, Victim 5 made a cash deposit of $6,000 into Jaes Jewelers' LLC Wells Fargo account (#1063).

b. On August 13, 2019, Victim 5 made a cash deposit of $15,000 into Full Exposure LLC's Chase account (#3581).

c. On August 21, 2019, Victim 5 made a cash deposit of $15,000 into Full Exposure LLC's Chase account (#3581).

d. On August 28, 2019, Victim 5 made a cash deposit of $30,000 into Full Exposure LLC's Chase account (#3581).

91. At "Leonard's" direction, Victim 5 sent a total of $66,000 via cash deposits to bank accounts connected with the entities JAES JEWELERS LLC and FULL EXPOSURE LLC. The deposited funds were later received and controlled by FASANYA, DARO, and ABRIELE.

*Distribution of Victim 5 Fraud Proceeds by/to Members of the Conspiracy*

92. On August 5, 2019, FASANYA made a $5,000 cash withdrawal from the Jaes Jewelers LLC Wells Fargo account (#1063).

93. On August 16, 2019, FASANYA, working with DARO and ABRIELE, made a

$12,000 wire transfer from the Full Exposure LLC Chase account (#3581) payable to QG Autos, LLC, an entity controlled by UCC-2.

94. On August 21, 2019, ABRIELE made a Zelle transfer of $3,000 to herself using funds from the Full Exposure LLC Chase account (#3581).

95. On August 22, 2019, DARO made a Cash App transfer of $1,000 to himself using funds from the Full Exposure LLC Chase account (#3581).

96. On August 23, 2019, FASANYA, working with DARO and ABRIELE, made a $10,975 wire transfer from the Full Exposure LLC Chase account (#3581) payable to QG Autos, LLC, an entity controlled by UCC-2.

97. On August 26, 2019, DARO made a Cash App transfer of $2,960 to himself using funds from the Full Exposure LLC Chase account (#3581).

98. On August 29, 2019, FASANYA, working with DARO and ABRIELE, made a $26,975 wire transfer from the Full Exposure LLC Chase account (#3581) payable to QG Autos, LLC, an entity controlled by UCC-2.

*Victim 6*

99. Victim 6 was a resident of Walnut Creek, California. Victim 6 began a romantic relationship on an online dating website in approximately 2019 with an individual using the name "Andrew Hansen". Victim 6 and "Hansen" communicated by phone calls, text message and emails. Ultimately, Victim 6 was duped out of funds as a result of a romance fraud scheme. The relationship lasted through late 2020.

100. As part of the scheme, the following representations were made:

a. "Hansen" asked Victim 6 to make payments on behalf of "Hansen" because "Hansen" needed funds to pay a fine associated with his international solar panel

business.

b. "Hansen" directed Victim 6 to transfer funds to a Utah based bank account. "Hansen" stated that the Utah bank account belonged to the customs official that fined "Hansen".

101. On September 19, 2019, at "Hansen's" direction, Victim 6 made a wire transfer of $10,000 into Full Exposure LLC's Chase account (#3581"). The deposited funds were later received and controlled by DARO, ABRIELE, FASANYA and other members of the conspiracy.

*Distribution of Victim 6 Fraud Proceeds by/to Members of the Conspiracy*

102. On or about September 19, 2019, through September 23, 2019, ABRIELE made three Zelle transfers totaling $1,490 to herself using funds from the Full Exposure LLC Chase account (#3581).

103. On September 23, 2019, FASANYA, working with DARO and ABRIELE, made a $7,475 wire transfer from the Full Exposure LLC Chase account (#3581) payable to QG Autos, LLC, an entity controlled by UCC-2.

104. On September 23, 2019, FASANYA, working with DARO and ABRIELE, sent a $1,800 transfer via Cash App from the Full Exposure LLC Chase account (#3581) payable to UCC-3.

*Victim 7*

105. Victim 7 was a resident of Sun Lakes, Arizona. Victim 7 began a romantic relationship on an online dating website in approximately September 2019 with an individual using the name "James Furst". Victim 7 and "Furst" communicated by text message and emails. Ultimately, Victim 7 was duped out of funds as a result of a romance fraud scheme. The relationship lasted through May 2021.

106. As part of the scheme, the following representations were made:

a. "Furst" asked Victim 7 to make payments on behalf of Furst as he was taken into custody and his passport was seized by immigration authorities.

b. At times, "Furst" stated that he was being tortured and physically beaten.

c. "Furst" stated that he did not have a foreign based bank account and that his funds were tied up. "Furst" stated that he would reimburse Victim 7 from a $10,600,000 commission fee he earned.

107. At "Furst's" direction, Victim 7 made the following funds transfers from a trust account:

a. On December 23, 2019, Victim 7 made an inter-account transfer of $30,500 into Full Exposure LLC's Chase account (#3581).

b. On June 5, 2020, Victim 7 made a wire transfer of $95,360.25 to Prime Lux and Co. Sun Trust account (#0064).

c. On June 8, 2020, Victim 7 made a wire transfer of $97,535.15 to BMI Innovation LLC's BOA bank account (#2620).

108. At "Furst's'" direction, Victim 7 sent a total of $223,395.40 via fund transfers to bank accounts identified as belonging to Full Exposure LLC, BMI Innovation LLC and to Prime Lux and Co. LLC. The deposited funds were later received and controlled by DARO, ABRIELE, FASANYA and other members of the conspiracy. These funds were ultimately funneled to members of the conspiracy.

*Distribution of Victim 7 Fraud Proceeds by/to Members of the Conspiracy*

109. On December 26, 2019, FASANYA, working with DARO and ABRIELE, obtained a cashier's check for $8,923 from the Full Exposure LLC Chase account (#3581) made

payable to FASANYA.

110. On December 27, 2019, FASANYA, working with DARO and ABRIELE, caused a "Cash App" transfer of $2,988 from the Full Exposure LLC Chase account (#3581) to UCC-3.

111. On December 30, 2019, FASANYA, working with DARO and ABRIELE, caused the wire transfer of $10,989 from the Full Exposure LLC Chase account (#3581) to FASANYA.

112. On June 9, 2020, FASANYA, working with UCC-5, arranged for two cashier's checks totaling $59,787.40 to be made out to FASANYA using funds from Prime Lux Sun Trust account (#0064).

113. On June 8, 2020, FASANYA, working with UCC-5, arranged for a $25,000 bank check to be issued to UCC-5 using funds from Prime Lux Sun Trust account (#0064).

114. On June 9, 2020, FASANYA, working with UCC-5, arranged for a $40,362.40 bank check to be issued to Fasanya using funds from Prime Lux Sun Trust account (#0064).

115. On June 9, 2020, FASANYA, working with UCC-5, arranged for a $19,425 bank check to be issued to Fasanya using funds from Prime Lux Sun Trust account (#0064).

116. On June 15, 2020, FASANYA purchased a $101,668.30 cashier's check made payable to BMI Innovations, LLC using the fraud proceeds from Victim 7 which had been deposited into BMI Innovation LLC's BOA bank account (#2620). Over the next several months, FASANYA and GARCIA worked together through a series of financial transactions to funnel a portion of Victim 7's fraud proceeds into accounts controlled by GARCIA.

117. On May 28, 2021, GARCIA purchased a cashier's check for $40,801.51 which funds were derived from Victim 7's fraud proceeds. GARCIA then used Victim 7's fraud proceeds to purchase a BMW vehicle which she registered in her name in Georgia on June 22, 2021.

*Victim 8*

118. Victim 8 was a business with offices located in Burlingame, California and Greenville, South Carolina. In approximately February of 2020, an unknown person defrauded Victim 8 out of funds as a result of an ACH fraud scheme.

119. As part of the scheme, the unknown person - posing as a legitimate vendor – submitted an ACH form to Victim 8 which requested a bank account change for future payments made by Victim 8 to the vendor. Based on the fraudulent ACH change form, Victim 8 was deceived into making approximately five outgoing payments totaling approximately $1.2 million between February 19, 2020, and March 18, 2020, to a bank account connected to the vendor. The vendor bank account was held in the name of "Wilson Consultanting Co."

120. As part of the scheme, on approximately February 21, 2020, an unknown person purporting to be "C. Wilson" caused "Wilson Consultanting Co" to issue a $41,536 check made payable to Full Exposure which funds were derived from stolen proceeds from Victim 8.

121. On February 26, 2020, the $41,535 check from "Wilson Consultanting Co" was deposited into Full Exposure's Chase account (#3581). The deposited funds were later received and controlled by DARO, ABRIELE, FASANYA and other members of the conspiracy.

*Distribution of Victim 8 Fraud Proceeds by/to Members of the Conspiracy*

122. On March 16, 2020, FASANYA, working with DARO and ABRIELE, obtained a bank check for $19,000 from the Full Exposure LLC Chase account (#3581) payable to FASANYA.

123. On March 10, 2020, FASANYA, working with DARO and ABRIELE, obtained a bank check for $10,000 from the Full Exposure LLC Chase account (#3581) payable to ABRIELE.

*Victim 9*

124. Victim 9 was a business located in Richmond, Virginia. Victim 9 was the subject of an attempted check fraud scheme in early March of 2020.

125. As part of the scheme, an unknown person fraudulently used Victim 9's bank account information to create a counterfeit check in the name of Victim 9.

126. At the direction of an unknown person, on March 2, 2020, a counterfeit check purportedly issued by Victim 9 in the amount of $136,830 was deposited into Full Exposure LLC, Chase account (#3581). On approximately March 5, 2020, Chase bank detected the fraudulent check and ultimately returned the funds to Victim 9 before the funds could be distributed from the Full Exposure bank account.

*Victim 10*

127. Victim 10 was a resident of Tinley Park, Illinois. Victim 10 began a romantic relationship on an online dating website in approximately June of 2018 with an individual using the name "Dioli Guarneri". Victim 10 and "Guarneri" communicated by email, text message and voice calls. Ultimately, Victim 10 was duped out of funds as a result of a romance fraud scheme. Victim 10 was deceived by "Guarneri" into conducting transactions using Victim 10's bank account which involved fraudulently obtained funds. The relationship lasted through approximately March of 2019.

128. As part of the scheme, the following representations were made:

a. "Guarneri" asked Victim 10 to make business loan payments on behalf of Guarneri to lenders because Guarneri was located outside of the U.S. and did not have the necessary funds to make payments.

b. "Guarneri" stated that he expected to be paid $2.5 million at completion of

an architecture project in South Africa.

c. "Guarneri" directed Victim 10 to make loan payments on his behalf to a person identified as "Asha Halverson". "Halverson" was in fact an associate of DARO who lived in Utah. DARO utilized a bank account held in "Halverson's" name to collect and transfer fraud funds.

129. At "Guarneri's" direction, Victim 10 made the following funds transfers:

a. On or about November 23, 2018, Victim 10 obtained a cashier's check for $25,000 to "Asha Halverson" and deposited the check into Halverson Chase account (#3139).

b. On or about December 21, 2018, Victim 10 obtained a cashier's check for $30,000 to "Asha Halverson" and deposited the check into Halverson Chase account (#3139).

c. On or about January 11, 2019, Victim 10 obtained a cashier's check for $13,500 to "Abriele Kosin" and deposited the check into Abriele Wells Fargo account (#0545).

130. At "Guarneri's'" direction, Victim 10 sent a total of $68,500 via cashier's checks to "Asha Halverson" and ABRIELE. The deposited funds were later received and controlled by DARO and ABRIELE.

*Distribution of Victim 10 Fraud Proceeds by/to Members of the Conspiracy*

131. On November 26, 2018, DARO made a Zelle transfer of $2,200 to himself using funds from the Halverson Chase account (#3139).

132. On November 26, 2020, DARO made a $22,465 payment to UCC-3 using funds from the Halverson Chase account (#3139).

133. On December 24, 2018, DARO made a $26,965 payment to Ice Box, Inc., a jewelry business in Georgia using funds from the Halverson Chase account (#3139).

134. On December 24, 2018, DARO made a Zelle transfer of $3,000 to himself using

funds from the Halverson Chase account (#3139).

135. On or about January 23, 2019, through January 25, 2019, ABRIELE and DARO working together made two withdrawals totaling $8,500 from the Abriele Wells Fargo account (#0545).

136. On or about January 28, 2019, ABRIELE and DARO working together made a $4,470 payment to Ice Box, Inc., a jewelry business in Georgia using funds from the Abriele Wells Fargo account (#0545).

*Victim 11*

137. Victim 11 was a resident of Canton, Georgia. Victim 11 began a romantic relationship on an online dating website in approximately May 2020 with an individual using the name "Caroline Laryea". Victim 11 and "Laryea" communicated by email, phone conversations, and video conferencing. Ultimately, Victim 11 was duped out of funds in the course of a romance fraud scheme. Victim 11 was deceived into conducting transactions using Victim 11's bank account which involved fraudulently obtained funds. The relationship lasted through approximately July 2020.

138. As part of the scheme, the following representations were made:

a. "Laryea" asked Victim 11 to be an advisor for "Laryea's" new business and that "Laryea" would compensate Victim 11 for Victim 11's services.

b. "Laryea" stated that she obtained a business loan and electronically introduced Victim 11 to bank employees "Willard Morley" and "Michael Scott Williams."

c. "Williams" advised Victim 11 that "Laryea's" loan proceeds would be deposited into Victim 11's account for purposes of making outgoing payments to "Laryea's" business vendors.

d. "Williams" informed Victim 11 that "Laryea's" business owed payment to various supply companies.

e . "Williams" directed Victim 11 to make a payment on "Lareyea's" behalf to a supplier who was identified as "Amy Maine" in Georgia. "Maine" was in fact a true person whose identify had been stolen. FASANYA and PINCkEY utilized "Maine's" stolen identity in the course of the conspiracy, including using bank accounts opened in "Maine's" name to collect and transfer fraud funds.

139. At "William's" direction, Victim 11 made the following transactions and funds transfers:

a. On July 7, 2020, Victim 11 obtained a cashier's check for $251,817 made payable to "Ms. Amy Maine".

b. On July 21, 2020, PINCKEY – who obtained possession of Victim 11's check - deposited the $251,817 cashier's check into the Amy Maine Citibank account (#3749). The deposited funds were later received and controlled by FASANYA and PINCKEY.

*Distribution of Victim 11 Fraud Proceeds by/to Members of the Conspiracy*

140. On August 3, 2020, FASANYA made an outgoing foreign wire transfer of $72,000 from the Amy Maine Citibank account (#3749) to the Land Bank of Taiwan with the listed beneficiary of Uniglife International Co. LTD.

141. On August 3, 2020, FASANYA made another outgoing foreign wire transfer from the Amy Maine Citibank account (#3749) to the Agricultural Bank of China in the amount of $30,000 with a listed beneficiary of Xu Dan Jun LTD.

*Victim 12*

142. Victim 12 was a resident of Northridge, California. Victim 12 began a romantic

relationship on an online social media platform in approximately July of 2020 with an individual using the name "Mark Roger Stammer". Victim 12 and "Stammer" communicated by social media and electronic messaging conversations. Ultimately, Victim 12 was duped out of funds as a result of a romance fraud scheme. The relationship lasted through approximately January of 2021.

143. As part of the scheme, the following representations were made:

a. "Stammer" stated that he was a General in the United States Army deployed to Afghanistan.

b. "Stammer" stated that he was responsible for a drone accident and was to stand trial. "Stammer" stated that he was incarcerated, not able to access his bank account and needed to hire an attorney. "Stammer" further stated that an individual identified as "Laura Young" was affiliated with "Stammer's" attorney.

c. "Stammer" stated that he intended to soon retire and use his retirement savings to purchase a home for both he and Victim 12.

d. "Stammer" directed Victim 12 to make payments on "Stammer's" behalf to "Laura Young". "Young" was in fact an alias identity utilized by FASANYA to collect and transfer fraud funds.

144. At "Stammer's" direction, Victim 12 made the following transactions and funds transfers:

a. On July 9, 2020, Victim 12 obtained a cashier's check for $25,000 to "Laura Young".

b. On July 9, 2020, Victim 12 obtained a second cashier's check for $25,000 to "Laura Young".

c. On or about July 9, 2020, Victim 12 used FedEx to send the two cashier's checks -- each for $25,000 -- to "Laura Young" at an address in Georgia which was provided by "Stammer". FedEx is a commercial interstate carrier.

145. At "Stammer's'" direction, Victim 12 sent a total of $50,000 via cashier's checks to "Laura Young". On or about July 10, 2020, the two checks were both deposited in the Laura Young Chase account (#8489) which account was controlled by FASANYA and PINCKEY.

*Distribution of Victim 12 Fraud Proceeds by/to Members of the Conspiracy*

146. On July 21, 2020, FASANAYA made a cash withdrawal for $3,000 from Laura Young Chase account (#8489).

147. On July 21, 2020, FASANYA, working with GARCIA, caused the deposit of $3,000 in cash into the Monica Brown Chase account (#2847).

148. On July 22, 2020, FASANYA made a cash withdrawal for $77,000 from the Laura Young Chase account (#8489).

149. On July 22, 2020, FASANYA, working with GARCIA, caused the deposit of $77,000 in cash to the Monica Brown Chase account (#2847).

150. On July 23, 2020, FASANYA transferred $1,000 to himself from the Laura Young Chase account (#8489) using a Cash App account.

151. From July 31, 2020, to September 16, 2020, GARCIA, working with FASANYA, received $46,638 in total from the Monica Brown Chase account (#2847) via multiple Square account transfers.

152. From September 18, 2020, to October 16, 2020, GARCIA, working with FASANYA, received $30,570 in total from the Monica Brown Chase account (#2847) via multiple Cash App account transfers.

153. On August 6, 2020, FASANYA wire transferred $10,050 from the Laura Young Chase account (#8489) to an account at the direction of UCC-4.

*Victim 13*

154. Victim 13 was a resident of O'Fallon, Illinois. Victim 13 began a romantic relationship on an online dating website in approximately May 2017 with an individual using the name "Dioli Guarneri". Victim 13 and "Guarneri" communicated by email, text and telephone calls. Ultimately, Victim 13 was duped out of funds as a result of a romance fraud scheme. The relationship lasted through approximately February of 2019.

155. As part of the scheme, the following representations were made:

a. "Guarneri" stated that he was a construction engineer working on a project based in South Africa.

b. "Guarneri" stated that he was at one point arrested and in need of financial assistance for his release. At other points in time, "Guarneri" stated that he needed financial assistance related to tax payments due to the South African government related to his business.

c. "Guarneri" directed Victim 13 to make payments on "Guarneri's" behalf to a "Richard Johnston". "Johnston" was in fact an alias identity utilized by FASANYA to collect and transfer fraud funds.

156. FASANYA – posing as "Johnston" - directed Victim 13 to make the following transactions and funds transfers:

a. On December 20, 2018, Victim 13 obtained and mailed a cashier's check for $19,000 to "Richard Johnston" for the benefit of "Dioli Guarneri" .

b. On January 4, 2019, Victim 13 obtained and mailed a cashier's check for $18,000 to "Richard Johnston".

157. At "Johnston's'" direction, Victim 13 sent a total of $37,000 via cashier's checks

to "Richard Johnston". Shortly after their issuance, Victim 13's two checks were both deposited into the Richard Johnston PNC Bank account (#7209) which was controlled by FASANYA.

158. On January 24, 2019, FASANYA – posing as "Johnston" – sent an interstate electronic communication to Victim 13 in which FASANYA requested that Victim 13 contact PNC bank's customer service to assist in releasing the funds from the cashier's checks to his benefit as PNC was questioning their legitimacy. FASANYA ultimately obtained access to Victim 13's funds in his PNC Bank account (#7209) and funneled the funds to members of the conspiracy.

*Distribution of Victim 13 Fraud Proceeds by/to Members of the Conspiracy*

159. On December 21, 2018, FASANYA made a $17,000 payment to Ice Box, Inc., a jewelry business in Georgia using funds from the Richard Johnston PNC Bank account (#7209).

160. On December 24, 2018, FASANYA made four cash withdrawals totaling $1,500 using funds from the Richard Johnston PNC Bank account (#7209).

161. On December 21, 2019, FASANYA made a $2,455 transfer of funds to DARO using funds from the Richard Johnston PNC Bank account (#7209).

162. On December 21, 2019, FASANYA made a $1,200 transfer of funds to UCC-3 using funds from the Richard Johnston PNC Bank account (#7209).

*Victim 14*

163. Victim 14 was a local government located in Erie, Colorado. Victim 14 was defrauded through an ACH fraud scheme in approximately October 2019. Victim 14 electronically received a vendor ACH payment enrollment form containing fraudulent information to make it appear as if it belonged to a legitimate vendor, namely, Victim 1. Based on the fraudulent vendor ACH form, Victim 14 was duped out of funds as a result of an ACH

fraud scheme.

164. On approximately October 21, 2019, UCC-1 sent an electronic wire communication to Victim 14's website which contained a vendor ACH payment enrollment form. The form contained information that seemingly appeared to belong to a legitimate vendor (Victim 1). In reality, the form submitted by UCC-1 contained fraudulent information, including an email address and bank account not associated with Victim 1.

165. On approximately October 25, 2019, Victim 14 processed the form and relied upon the false information on the form to make a $1,016,233.80 ACH Citibank payment. The ACH funds transfer went from Victim 14's Colorado bank account to a Florida bank account not associated with Victim 1, which account in reality belonged to another individual and was utilized by "Casper Forbes."

All in violation of Title 18, United States Code, Sections 1956(h) and 2.

## FORFEITURE ALLEGATION

166. The allegations contained in Count One of this Indictment are hereby re-alleged and incorporated by reference for the purpose of alleging forfeiture pursuant to the provisions of 18 U.S.C. § 982(a)(1).

167. Upon conviction of the violations alleged in Counts One of this Indictment involving the commission of violations of Title 18, United States Code, Sections, 1956(h) and 2, Defendants ADEBAYO FASANYA, DARO KOSIN, ABRIELE J. KOSIN, PORSHA PINCKEY, and STEPHANIE GARCIA, shall forfeit to the United States, pursuant to Title 18, United States Code, Section 982(a)(1) any and all of the defendants' right, title and interest in all property, real or personal, involved in such offense, or all property traceable to such property, including, but not limited to, a money judgment in the amount of proceeds obtained by the

defendants.

168. If any of the property described above, as a result of any act or omission of the defendant:

a) cannot be located upon the exercise of due diligence;
b) has been transferred or sold to, or deposited with, a third party;
c) has been placed beyond the jurisdiction of the Court;
d) has been substantially diminished in value; or
e) has been commingled with other property which cannot be subdivided without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 28, United States Code, Section 2461(c), to seek forfeiture of any other property of said defendant up to the value of the forfeitable property.

A TRUE BILL

*Ink signature on file with the Clerk's Office*
FOREPERSON

COLE FINEGAN
United States Attorney

By: s/ Tim R. Neff
TIM R. NEFF
Assistant United States Attorney
U.S. Attorney's Office
1801 California Street, Suite 1600
Denver, CO 80202
Telephone: (303) 454-0100
Fax: (303) 454-0402
E-mail: tim.neff@usdoj.gov